**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 14-20118-02-JAR** |
| ) | |
| **STEVE A. WATTS,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant Steve A. Watts' Motion to Suppress Statements Obtained in Violation of the Fifth and Fourteenth Amendments (Doc. 26). On May 11, 2015, the Court held an evidentiary hearing on the motion to suppress. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule. As described more fully below, the Court denies Defendant's motion to suppress.

**I.      Facts**

Based on the testimony and the audio/video evidence submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence. On February 29, 2014, Overland Park, Kansas Police Detective Derrick Wilczek was on general assignment when Overland Park dispatch relayed that there was an armed robbery in progress at the Bank of America ("BOA"), located at 95th Street and Mission Road in Leawood, Kansas. Because Detective Wilczek and his partner, Detective Kyle Twaddle, were the only two detectives in the building at the time of the call, just before 5:00 p.m., they responded. The detectives listened to radio traffic from Overland Park dispatch while en route to the scene. Dispatch relayed that

witnesses could see inside the bank and were providing information to responding units.  Also, a dispatcher was on the phone with BOA's remote security center, which was viewing a live video feed from inside the bank and relaying information back to the dispatcher.  The detectives learned that the security cameras and witnesses saw people inside the bank, that witnesses had seen two or more robbers or people inside the bank, that there were several employees and at least one customer inside the bank, and that one individual was seen on the floor of the bank.  Law enforcement was trying to make contact with the people inside the bank without success.

At about 5:25 p.m., Detectives Wilczek and Twaddle arrived on the scene.  Because this BOA was near the border of Prairie Village, Leawood, and Overland Park, Kansas, officers from all three departments responded to the robbery.  As the detectives arrived, they heard the dispatcher report that two individuals were in custody, one of whom was apprehended after a foot chase.  The detectives stopped their vehicle on Mission Road where the incident commander asked them to make contact with Defendant Watts, who was seated in the back of a Leawood police vehicle at the McDonald's parking lot on the corner of 95th and Mission Road, approximately 100 yards from the BOA.  Watts was handcuffed.

At this point, officers were still unsuccessfully trying to make contact with individuals inside the bank through a police P.A. system, and by phone.  Officers, including Detective Wilczek, did not know whether there were any injuries or whether there was still a suspect inside the bank, and were concerned about an active hostage situation.  The officers were also concerned that a firearm had been left inside the bank because Watts had been apprehended unarmed, and officers had not located a firearm in the area.  The entire intersection of 95th and Mission Road was closed to traffic at this point, and officers had guns pointed at the building.

2

The second suspect was in custody in another patrol car across the street.

When the detectives arrived at the McDonald's parking lot, other officers told them that they had made contact with Watts, but could not elicit much information. Detective Wilczek first approached Watts and spoke to him by leaning through the open rear door of the patrol car. Detective Twaddle was also present, standing behind Detective Wilczek. This first contact with Watts was recorded on Detective Wilczek's cell phone and there is also a video recording from inside the patrol car. Detective Wilczek identified himself and told Watts that he was concerned about the safety of the officers and the people inside the bank, and asked him if there was anyone else inside the bank. Watts responded, "I don't know." Detective Wilczek next asked Watts if his "partner" had already read him his *Miranda* rights. Watts said "no," the Leawood police officer had not Mirandized Watts. Detective Wilczek then asked if Watts had ever been arrested, and then asked if he had been arrested for homicide. He testified that he routinely asks suspects this question as an "icebreaker," because in his experience, most suspects' criminal history involves a lesser crime. In his experience, he has found that a suspect's answer to this question will let him know if the suspect will be honest with him. Watts responded that he had served time for homicide.

Detective Wilczek broke contact with Watts in order to radio information to the incident commander given that the situation inside the bank had not yet changed—a person was still seen on the ground and police were still unable to make contact with anyone inside the bank. The radio transmissions also indicated that the other suspect had not provided helpful information about whether there was still a suspect in the bank, or whether anyone inside was hurt.

After about two minutes, Detective Wilczek re-engaged Watts, who was still seated

3

handcuffed in the backseat of the patrol car.  Detective Wilczek asked Watts if anyone inside the building was hurt.  Defendant responded, "I am not hurt."  He next asked if anyone was inside the building, and Watts responded that he did not know.  Detective Wilczek was careful to tell Defendant that he was only asking him questions at that point in order to ensure the safety of the officers and the individuals still inside the bank.  Detective Wilczek asked Watts if it was safe to say that everyone in the bank was okay, to which Watts responded, "I can't say—I wasn't dealing with anyone."

Watts then asked for medical attention, citing a prior heart issue.  Detective Wilczek stayed with Defendant while he was treated by Johnson County paramedics.  He asked Watts about his health issues but did not persist in asking questions about the robbery or the status of the people still inside the bank.

After about one hour on the scene, the detectives decided to transport Watts to the Sanders Justice Center, which is the booking facility for the Johnson County Police Department.  When they left, the scene was still active and law enforcement was still unsure whether they were dealing with a hostage situation.  Detective Wilczek, who is also assigned to the FBI's joint child exploitation task force, contacted FBI agents, who were en route to the bank.  The FBI agents intended to interview Watts later at the booking facility.  Because Detective Wilczek knew that the FBI agents would be interviewing Watts about the robbery, he did not plan to interview him.  However, Watts did have a conversation with Detective Twaddle while waiting for FBI agents to respond.  Watts was advised of his rights under *Miranda* when FBI agents arrived.  He invoked his right to remain silent and was not interviewed.

## II.    Discussion

Under *Miranda v. Arizona*,[1] the prosecution may not use incriminating statements against a Defendant at trial unless it demonstrates that it employed certain procedural protections to safeguard the Fifth Amendment privilege against self-incrimination.[2]  As a general rule:

> *Miranda* warnings are required when the defendant is in custody and subject to interrogation.  In order to determine whether or not a person is in custody for *Miranda* purposes, a court must examine all relevant facts, the only relevant inquiry being how a reasonable person in the suspect's position would have understood his situation. If, from an objective viewpoint, someone in [the defendant's] position would reasonably believe [his] freedom of action had been curtailed to a degree associated with a formal arrest, then [he] would be held in custody during the interrogation.[3]

Thus, a *Miranda* warning is required when a defendant is (1) subject to interrogation, *and* (2) in custody.  For the first prong, interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[4]  For the second prong, the Tenth Circuit suggests several factors that are useful in testing the atmosphere of custody, including: the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will; the nature of questioning (limited questioning to confirm an officer's suspicions is less coercive than prolonged accusatory questioning); and whether the atmosphere is "police dominated" (i.e. separation of the suspect from family or colleagues who could offer moral support, isolation in

---

[1]384 U.S. 436 (1966).

[2]*Id*. at 444.

[3]*United States v. Griffin*, 7 F.3d 1512, 1517–18 (10th Cir. 1993) (citing *Miranda*, 384 U.S. at 444) (citations and quotation marks omitted).

[4]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted).

nonpublic questioning rooms, threatening presence of several officers, display of a weapon by an officer, physical contact with the subject, and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled).[5]

Statements made in violation of *Miranda* may still be admissible under the public safety exception announced in *New York v. Quarles.*[6]  Under this doctrine, "an officer may question a suspect in custody without first giving the *Miranda* warnings if the questions arise out of 'an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon.'"[7]  The Tenth Circuit has adopted the following standard for determining whether a sufficient threat to officer safety exists for purposes of *Quarles*: the officer "'must have a reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it.'"[8]

The Court agrees that the public safety exception applies to any pre-*Miranda* statements Watts made in response to Detective Wilczek's questions at the scene of the robbery.  The evidence presented at the hearing convinces the Court that these questions were asked in furtherance of ascertaining whether there were outstanding armed suspects inside the bank, and whether anyone inside was injured.  Detective Wilczek was careful to limit his questions to elicit information about the safety of officers and witnesses, and the record demonstrates that the

---

[5]*Griffin*, 7 F.3d at 1518–19; *see also United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

[6]467 U.S. 649 (1984).

[7]*United States v. Mikolon*, 719 F.3d 1184, 1187 (10th Cir. 2013) (quoting *Quarles*, 467 U.S. at 659 n.8); *United States v. DeJear*, 552 F.3d 1196, 1201–02 (10th Cir. 2009).

[8]*DeJear*, 552 F.3d at 1201 (quoting *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007)).

information available to him through radio dispatch at the time of the questioning would create an objectively reasonable need to protect the police or public from immediate danger associated with a weapon.  When Detective Wilczek questioned Watts, law enforcement had not yet determined whether there was a hostage situation inside the bank, witnesses could still see an unresponsive person on the floor of the bank, and their efforts to communicate with those employees and customers still in the bank had been unsuccessful.  Moreover, Detective Wilczek knew that neither suspect had been apprehended with a firearm and neither suspect would confirm whether there was another suspect inside the bank.  Detective Wilczek therefore reasonably believed a firearm may be missing, or still inside the bank.  The Court denies Defendant's motion to suppress as to any pre-*Miranda* statements Watts provided to Detective Wilczek under the public safety exception to the *Miranda* rule.  In so ruling, the Court does <u>not</u> comment on the admissibility of Defendant's statement about his criminal history under Fed. R. Evid. 403 or 404(b).

There was no evidence presented at the hearing about the nature of Detective Twaddle's conversation with Watts at the booking facility, and the Government does not intend to introduce these statements during its case-in-chief at trial.  Therefore, the motion to suppress is moot as to pre-*Miranda* statements Watts made to Detective Twaddle at the Sanders Center.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Steve A. Watts' Motion to Suppress Statements Obtained in Violation of the Fifth and Fourteenth Amendments (Doc. 26) is **denied**.

**IT IS SO ORDERED**.

Dated: <u>May 15, 2015</u>

7

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE